

ECEIVE

MAR 23 2010

U.S.D.C. S.D. N.Y.
CASHIERS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ARGENTTO SYSTEMS, INC. and NICK SANTINO,<br><br>Plaintiffs,<br><br>v.<br><br>JOSHUA KAUFMAN; PRADEEP BUBNA; LOKENDRA JAIN; MARTIN FLYER JEWELRY LLC; KGK JEWELRY LLC; KGK JEWELRY MFG. LTD.; ALAN BLOOM; PRASAD SAHOO; ACCURATE GRADING QUALITY ASSURANCE, INC.; STEVE YEKO; and TED KRAPF,<br><br>Defendants. | Civil Action No.: 09-cv-9870 (RJS) (KNF)<br><br>**AMENDED COMPLAINT FOR INJUNCTIVE RELIEF AND MONEY DAMAGES**<br><br>JURY TRIAL DEMANDED |

Plaintiffs ARGENTTO SYSTEMS, INC. and NICK SANTINO, by the undersigned, as and for their Amended Complaint against Joshua Kaufman, Pradeep Bubna, Lokendra Jain, Martin Flyer Jewelry LLC ("Martin Flyer LLC") (together, the "Martin Flyer Defendants"), KGK Jewelry LLC, KGK Jewelry Mfg. Ltd., Alan Bloom, Prasad Sahoo (together, the "KGK Defendants"), Accurate Grading Quality Assurance, Inc. ("AGQA"), Steve Yeko, and Ted Krapf (together, the "AGQA Defendants") (the MF Defendants, KGK Defendants, and AGQA Defendants, collectively, the "Defendants"), allege as follows:

### INTRODUCTION

1.    This action arises from Defendants' blatant acts of theft of Plaintiffs' intellectual property and trade secrets, Defendants' disregard for their contractual obligations to Plaintiffs, and their abuse of the relationship of confidence and trust that they intentionally developed with Plaintiffs.

2.    Plaintiffs developed and copyrighted unique and specialized comprehensive accounting and business automation software (the "ASI Financials Software") that Martin Flyer LLC's predecessor, Martin Flyer, Inc., used for over seven years, with great success and little to

none of the business interruptions caused by many competing software products on the market.

3.      At some point before or during or immediately after a trial of Plaintiffs' copyrighted, unique, and proprietary software, Joshua Kaufman concluded that it would be cheaper to simply use an unlawfully obtained copy of Plaintiffs' software than it would be to buy a licensed copy of it, so that is what he did.

4.      The Defendants have used, and continue and will continue to use, Plaintiffs' intellectual property as a key element of their jewelry production and sales businesses, and garner millions of dollars in profits by doing so.

5.      The Martin Flyer Defendants have misappropriated Plaintiffs' intellectual property not only for use in their own business, but they have also invited the AGQA Defendants and KGK Defendants to loot Plaintiffs' intellectual property and pick through it to see if there is anything they can use for their own businesses and financial gain.

6.      Both the AGQA Defendants and KGK Defendants have readily accepted the Martin Flyer Defendants' unlawful invitation, and have likewise misappropriated Plaintiffs' intellectual property and unlawfully gained substantial profits from doing so.

7.      This lawsuit seeks preliminary and permanent injunctive relief to prevent Defendants from causing irreparable harm to Plaintiffs, as well as millions of dollars in damages and disgorgement of profits to redress Defendants' copyright infringement in violation of the federal copyright laws, violations of the Digital Millennium Copyright Act, violations of the Computer Fraud and Abuse Act, misappropriation of Plaintiffs' trade secrets and other confidential information, unfair competition, unjust enrichment, and breach of contract.

## PARTIES, JURISDICTION AND VENUE

8.      Plaintiff Argentto Systems, Inc. ("Argentto") is a software development company with its principal place of business in New York, New York.

2

9.      Plaintiff Nick Santino is the President of Argentto and its principal software developer.  Mr. Santino resides in New York, New York.

10.     Defendant Joshua Kaufman is an employee and the Chief Executive Officer of Martin Flyer LLC, and regularly performs his work in that capacity in New York, New York.  On information and belief, Joshua Kaufman resides in New York, New York.

11.     On information and belief, Defendant Pradeep Bubna is an employee of Martin Flyer LLC, and regularly performs his work in that capacity in New York, New York.  On information and belief, he also has an employee and/or agency relationship with Defendant KGK Jewelry LLC and/or KGK Jewelry Mfg. Ltd., and regularly performs work in said capacity in New York, New York.

12.     On information and belief, Defendant Lokendra Jain is an employee of defendant MF LLC, and regularly performs his work in that capacity in New York, New York.

13.     Defendant Martin Flyer Jewelry LLC is a domestic corporation with its principal place of business located in New York, New York.

14.     Defendant KGK Jewelry LLC ("KGK Jewelry (NY)") is a domestic corporation with its principal place of business in New York, New York.  On information and belief, it is owned in whole or in part, and either directly or through a subsidiary, by the KGK Group, which describes itself as a global corporation based in India.

15.     On information and belief, Defendant KGK Jewelry Mfg. Ltd. ("KGK Jewelry (China)") is a Chinese company with its principal place of business in Panyu, Guangzhou, China.  On information and belief, it is owned in whole or in part, and either directly or through a subsidiary, by the KGK Group.

16.     On information and belief, Defendant Alan Bloom is an employee of Defendant KGK Jewelry (NY), and regularly performs work in that capacity in New York, New York.

17.     On information and belief, Defendant Prasad Sahoo is an employee of Martin Flyer LLC and regularly performs his work in that capacity in New York, New York.  On information and belief, he also has an employee and/or agency relationship with Defendant KGK Jewelry (NY) and/or KGK Jewelry (China), and regularly performs work in said capacity in New York, New York.

18.     Defendant Accurate Grading Quality Assurance is a Wisconsin corporation with its principal place of business in Janesville, Wisconsin.

19.     On information and belief, Defendant Steve Yeko is the Owner and President of AGQA, and resides in Wisconsin.

20.     On information and belief, Defendant Ted Krapf is, or was during the period relevant to this action, an employee and the Chief Technical Officer of AGQA.

21.     The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1338(a), and 1367.  Plaintiffs allege claims for copyright infringement arising under the Copyright Act of 1976, 17 U.S.C. §§ 101 *et seq.*, the Computer Fraud and Abuse Act, 18 U.S.C. §§ 1030 *et seq.*, and for related common law and state law claims of misappropriation of Plaintiffs' trade secrets and other confidential information, unfair competition, unjust enrichment, breach of contract, and tortious interference with Plaintiffs' contractual relations.

22.     Venue is proper in this District under 28 U.S.C. §§ 1391(b) and 1400(a), as a substantial part of the events giving rise to this action occurred in this District, and Defendants may be found in this District.

## FACTUAL BACKGROUND

23.     Nick Santino founded Argentto in 2001.  Argentto is a software development and consulting company that develops, customizes and provides computer software solutions to businesses ranging from computer and other manufacturers to law firms to investment banks.

Argentto offers a full suite of software programs, from accounting enterprise systems, to oil trading software platforms, securities portfolio management software, legal case management software, and various interactive web applications.  In addition, Argentto provides information technology ("IT") consulting and support services to its clients.

24.     As a leading developer of software based on proven Microsoft technologies, Argentto has developed unique intellectual property unparalleled in its industry, including multi-company accounting software that permits entities with multiple business units to consolidate their general ledgers into a single database, investment portfolio management software, and interactive web-based job posting software that integrates the needs of job candidates, staffing services, and potential employers.  Argentto has applied for and/or obtained copyright registrations for these and other software packages it has developed for sale to its clients.

## THE ASI FINANCIALS SOFTWARE

25.     In or around 2002, Plaintiffs developed, with the investment of considerable expense and programmer time, a unique and proprietary software system that allows, among other unique and proprietary features, a business to consolidate its accounting across multiple businesses or business units onto a single, uniform set of books.

26.     The ASI Financials Software not only provides licensees with great time and cost savings related to bookkeeping and accounting tasks, its automation of many tasks and aggregation of myriad data also contributes greatly to operational efficiency, and helps a company like Martin Flyer LLC increase sales and productivity, thereby driving more revenue to the bottom line.

27.     In addition, these accounting and operational improvements allow ASI Financials licensees to pursue and service markets they would otherwise be unable to manage, thereby also increasing overall revenue.

5

28.     For example, in the jewelry business, a substantial amount of the merchandise on display at many retailers is there "on memo," which is very similar to "on consignment," and means that the retailer only has to pay the wholesaler for the merchandise if it sells, and can return unsold merchandise to the wholesaler. While this practice can help generate more sales, it can also be quite costly if the merchandise is not tracked properly and is not returned. In response to this dilemma, Plaintiffs created a software module that integrates with ASI Financials Software and makes tracking merchandise out "on memo" much easier and more accurate, which not only helps a jewelry wholesaler save money servicing business it already has, but allows it to greatly expand its "on memo" business safely and profitably. This component was part of the software package at issue in this litigation.

29.     As part of its customer relationships, ASI inevitably adapts its software packages to the needs of each particular customer. On the most basic level, ASI Financials Software is available in several pre-set configurations, with customers free to choose which configuration best fits their particular business needs. In addition, ASI has a large software library from which it can add components to a given customer's software package, which provides exceptional flexibility and allows customers to license only what they need for their unique business. That customization work, and ongoing support of the software once the customer has implemented it, constitutes a major portion of ASI's workload and revenue generation.

30.     Plaintiffs' clients and prospective clients are attracted by the unique and proprietary features of the ASI Financials Software, including ASI's ability to tailor the software to each particular client's needs, and some even remark that they have expended substantial sums of time and money in what have turned out to be unsuccessful efforts to achieve the functionality and usability of the ASI Financials Software.

31.     Although it is based on proven Microsoft technologies such as the SQL Server

database software, the user interface, data algorithms, data tables, drivers, and database structure of the ASI Financials Software consist of numerous original constituent elements.  It contains several hundred thousand lines of software source code, over 400 data tables, 190 views, and 800 stored procedures, each of which incorporates copyrighted source code and/or otherwise proprietary information.  The ASI Financials Software took over 6,000 hours of Argentto programmer time over an extended period of time to write.

32.     In order to fully protect their exclusive rights to the intellectual property embodied in the ASI Financials Software, Nick Santino registered it with the U.S. Copyright Office and received Registration Number TX 7-018-267, effective March 10, 2009, and then exclusively licensed it to ASI so that ASI could license it to clients.

### ARGENTTO'S EFFORTS TO PROTECT
### THE ASI FINANCIALS SOFTWARE AND OTHER TRADE SECRETS

33.     Argentto maintains the confidentiality of its trade secrets, including its proprietary source and object code, in many ways.

34.     First, all Argentto employees and contractors are required to sign strict confidentiality and non-disclosure agreements.

35.     Second, Argentto's programmers who develop, test, maintain and upgrade its source and object code are the only individuals at Argentto who have access to that code through password-protected computers.  Argentto provides each programmer with a user name and password without which the programmer cannot access the system on which the source code resides.

36.     Third, Argentto programmers are prohibited from working on Argentto software outside the office.  At the office, Argentto programmers are permitted access only to their own workstations and computers.

37.     Fourth, Argentto's offices, including the servers on which its proprietary software resides, are locked, secured, and protected by guard dog.

38.     Fifth, despite ASI's often close and ongoing working relationship with many of its customers, and while Argentto provides its actual and prospective customers and licensees with access to its software user interfaces to view its form and functionality, and may offer limited access to underlying data to the extent the customer or licensee requires such access for daily use, absolutely *no one* other than Argentto's own computer programmers is granted permission to access the source and object code embodying that software.

39.     Finally, ASI customers are required to agree to certain terms regarding confidentiality, reverse engineering, and the like in order to be granted a license, as described more fully below.

### THE RELATIONSHIP BETWEEN NICK SANTINO AND ARGENTTO AND THE FLYER FAMILY AND MARTIN FLYER INC.

40.     First, in order to avoid confusion, it is important to be clear that Martin Flyer, Inc. ("Martin Flyer, Inc.) is an entirely different entity from defendant Martin Flyer Jewelry, LLC ("Martin Flyer, LLC"), and is not itself a defendant in this action.

41.     Martin Flyer, Inc. – loosely speaking the predecessor of Martin Flyer Jewelry LLC – is a decades-old multi-generational family jewelry business that was controlled and run by Gary and Alan Flyer, and which employed Joshua Kaufman, through mid-2009.

42.     In or around 2002, ASI granted Martin Flyer, Inc. a limited, non-transferrable license, whereby Martin Flyer, Inc. was granted certain rights to use the ASI Financials Software. No one from Martin Flyer, Inc., however, was permitted to access the source code or other protected elements of the ASI Financials Software, or permitted to add or alter any data base objects. Nick Santino alone, on behalf of ASI, was permitted to manage the system.

43.     Certain Terms & Conditions were essential terms of the licensing agreement

between ASI and Martin Flyer, Inc., and were included with every invoice ASI sent to Martin

Flyer, Inc. (averaging at least one invoice per month over the course of several years).  The

Terms & Conditions state, in relevant part:

## OWNERSHIP RIGHTS

**5.1 Ownership.**  As between *Client* and *Argentto Systems, Inc.*, except as set forth
below in this Section 6, all right, title, and interest, including copyright interests
and any other intellectual property, in and to the Software produced or provided
by *Argentto Systems* under this Agreement shall be the property of *Argentto
Systems, Inc..*  To the extent of any interest of *Client* therein, *Client* agrees to
assign and, upon its creation, automatically assigns to *Argentto Systems* the
ownership of such Software, including copyright interests and any other
intellectual property therein, without the necessity of any further consideration.

**5.2 *Client* Data.**  All right, title, and interest in and to any data relating to *Client*'s
business are and shall remain the property of *Client*, whether or not supplied to
*Argentto Systems, Inc.*

### RESPONSIBILITIES OF *Client* FOR SOFTWARE.

**6.1 Limitations on Use.**  *Client* may not use, copy, or modify the Software, or any
copy, adaptation, transcription, or merged portion thereof, except as expressly
authorized by *Argentto Systems* hereunder.  *Client*'s rights may not be transferred
except to a successor in interest of *Client*'s entire business who assumes the
obligations of this Agreement.  No service bureau work, multiple-user license, or
time-sharing arrangement is permitted.  If *Client* uses, copies, or modifies the
Software or transfers possession of any copy, adaptation, transcription, or merged
portion of the Software to any other party in any way not expressly authorized
hereunder, *Client*'s license is automatically terminated.

### PROPRIETARY INFORMATION

**7.1 Trade Secrets.**  Client acknowledges that in order to perform the services
called for in this Agreement, it shall be necessary for Argentto Systems to disclose
to Client certain Trade Secrets that have been developed by Argentto Systems at
great expense and that have required considerable effort of skilled professionals.
Client further acknowledges that the Software will of necessity incorporate such
Trade Secrets.  Client agrees that it shall not disclose, transfer, use, copy, or allow
access to any such Trade Secrets to any employees or to any third parties,
excepting those who have a need to know such Trade Secrets in order to give
effect to Client's rights hereunder and who have bound themselves to respect and
protect the confidentiality of such Trade Secrets.  Any object created, deleted or

modified by end user is a violation of licensing. In no event shall Client disclose any such Trade Secrets to any competitors of Argentto Systems, Inc.

**7.2 Scope of Restriction.** As used herein, the term "Trade Secrets" shall mean any scientific or technical data, information, design, process, procedure, formula, or improvement that is commercially valuable to Argentto Systems and not generally known in the industry.

44.     In addition to these Terms & Conditions, the "ASI End-User Registration and

Customer License Agreement" (the "End-User Agreement") contains the following prohibitions

on all licensees:

YOU MAY NOT: (a) Make copies of the Program, except as specifically authorized above; (b) Make copies of the Documentation; (c) Rent, lease, lend, sublicense, time-share or otherwise permit any other party to use the Program, Program Copies or Documentation or to exercise your rights under this Agreement; (d) Alter, modify, translate, decompile, disassemble or reverse-engineer the Program, or make any attempt to undo or bypass the encryption of the Program code, or create any derivative work based upon the Program; (e) Remove or obscure any copyright or trademark notices.

45.     Over the course of the next seven years, Plaintiffs developed an excellent working

relationship of trust and confidence with both Gary and Alan Flyer, who represented the second

and third generations, respectively, of their family jewelry business.

46.     In or around 2006, Martin Flyer, Inc. entered into an arrangement with AGQA

whereby AGQA would provide Martin Flyer, Inc.'s customers with cards that purport to establish

the authenticity of the jewelry – i.e. provide "accurate grading quality assurance." In conjunction

with that deal, Plaintiffs were asked to and did create a software module that would ensure that

Martin Flyer, Inc.'s data was in a format compatible with AGQA's proprietary system, so that the

production of the AGQA cards would be automated, thereby providing AGQA's profit margin.

That software module was incorporated into the software at issue in this litigation.

47.     In or around mid- to late-2007, Steve Yeko approached Nick Santino about

working together with the goal of making the ASI module described above work with all

AGQA's potential customers, thereby increasing AGQA's profit margin on any such future deals, and making AGQA's product more attractive to potential customers.

48.    After inquiring about Mr. Yeko's reputation for trustworthiness in the business world, Plaintiffs declined to work with Mr. Yeko or AGQA.

49.    Shortly after being finally turned down by Plaintiffs, Mr. Yeko, in his capacity with AGQA, and in conjunction with Ted Krapf, who is an IT professional, approached Alan Flyer about getting access to Plaintiffs' proprietary software through Martin Flyer, Inc.'s licensed use of it.

50.    Gary and Alan always fully respected Plaintiffs' rights to their intellectual property, and did everything they could to assist Plaintiffs in keeping it protected from third parties, as was the case here.  When the AGQA Defendants made this request, Alan declined and told them, consistent with the Terms & Conditions and the End-User Agreement, as well as the of copyright and trade secrets, that both the code and the database structure of ASI Financials Software are Plaintiffs' protected intellectual property (including as licensed to ASI).

51.    As a result of this and similar instances, Plaintiffs and Martin Flyer, Inc. developed a relationship of trust and confidence regarding each other's proprietary information.

52.    Martin Flyer, Inc. not only continued to use the initial ASI Financials Software package during the seven years before the KGK deal, but also ordered many upgrades, large and small, that added functionality to the system and made it more tailored and useful to their business.

53.    Because Plaintiffs had such trust in Gary and Alan, Plaintiffs hosted the ASI Financials Software on Martin Flyer, Inc.'s server, rather than at ASI's offices or a dedicated ASI-owned server at their office.

54.    Gary and Alan always understood that the services and products ASI was

providing them, including ASI's standard maintenance services at $500.00 per month, were fairly priced and extremely valuable to their company, making them well worth the investment. As such, Martin Flyer, Inc., through Gary and Alan Flyer, always paid ASI's invoices for software and software/database support on a timely basis, and never tried to renegotiate any pricing after the fact. In return for being such a valued customer and for always behaving honestly and honorably regarding ASI's intellectual property, Plaintiffs never raised ASI's hourly rates on work done for Martin Flyer, Inc.

55.     Martin Flyer, Inc. remains a licensee of Argentto's ASI Financials Software, and continues to use it from time to time, and continued to use ASI's IT services until recently.

### THE SALE OF MARTIN FLYER TO KGK

56.     In or around March or April 2009, Alan Flyer informed Nick Santino (in strict confidence at the time because such deals must be kept confidential for business purposes until finalized) that Martin Flyer, Inc. was looking for a buyer. Other than being given this small piece of information, Plaintiffs were not otherwise involved in the process.

57.     In or around June 2009, Alan Flyer informed Nick Santino (under the same confidence) that Martin Flyer, Inc. had found a potential buyer, but again, Plaintiffs were not involved in the process. As Plaintiffs had no involvement or knowledge regarding how the deal was going to be structured, Plaintiffs assumed that the whole entity would be sold – i.e. that Martin Flyer, Inc. would continue as a going concern under the same corporate structure, but would simply have new owners.

58.     On July 1, 2009, Gary Flyer called Nick Santino – out of the blue – and asked him to prepare a letter indicating that Martin Flyer, Inc. had a valid license (under and limited by the terms described above), and describing the fee structure for ASI's support and other technical services moving forward. Gary's request was urgent, so Nick Santino prepared and signed the

12

requested letter that same day.

59.     As is evident from the face of it, this letter was prepared under the assumption that Martin Flyer, Inc. was being sold as an entire entity, and therefore simply reiterated that Martin Flyer, Inc. had a valid license and described what Martin Flyer, Inc. received (and would continue to receive) in exchange for the $500.00 monthly maintenance fee, which fee had nothing to do with the license itself.

60.     This letter was accepted by Gary Flyer on behalf of Martin Flyer, Inc., and, as best as Plaintiffs now understand the facts, was shared with the potential buyer whose identity Plaintiffs did not know at the time.

61.     In or about the middle of July 2009, Plaintiffs came to realize that Martin Flyer, Inc. had not, in fact, been sold, but rather was – and remains to this day – a going concern with millions of dollars in business.

62.     Instead of selling Martin Flyer, Inc. in and of itself, it appears that Gary and Alan Flyer just sold most of the assets of Martin Flyer, Inc. to the KGK Buyer, and a new Martin Flyer entity called Martin Flyer Jewelry, LLC was formed ("Martin Flyer, LLC") (a defendant in this lawsuit).

63.     As best as Plaintiffs understand (still not having seen the deal documents), Martin Flyer, LLC effectively took over the Martin Flyer, Inc. business, insofar as Martin Flyer, LLC operates under the various brand names previously used by Martin Flyer, Inc. ("Martin Flyer," "Flyer Fit," etc.), operates out of the same physical space, uses the same computer equipment (including the same server), employs virtually the same group of people, uses the same vendors, sells to the same customers, and the like. The Flyer family, however, is not actively involved in the new venture, which is not under the leadership of Gary and Alan Flyer, but instead is being run by defendants Joshua Kaufman (Gary Flyer's son-in-law) and Pradeep Bubna, who either

used to work for some sub-entity of the KGK Group or now has positions with both the KGK Group and Martin Flyer, LLC.

64.    Martin Flyer, Inc., however, retained millions of dollars worth of merchandise and millions of dollars in receivables, and is still actively selling off the merchandise and attempting to collect on the receivables. In addition, until very recently, Martin Flyer, Inc. continued to use the ASI Financials Software on a regular basis, through ASI's servers, with Gary and Alan both logging on to the system to enter new activity at least twice a week on average, and continued to use ASI for information technology ("IT") support. While Plaintiffs reduced the monthly maintenance fee (voluntarily and without being asked) because the Martin Flyer, Inc. remains a good customer and because it has reduced its activity, until very recently Martin Flyer, Inc. still paid ASI $200.00 per month as the "monthly maintenance fee" described in the July 1, 2009 letter described above.

65.    While the precise details of the deal are still not known to Plaintiffs, the Martin Flyer and KGK Defendants purportedly bought historical data regarding Martin Flyer, Inc.'s sales prior to the KGK deal. Plaintiffs were not consulted about this purported data sale, or even told about it, and were not asked about the feasibility of using that data without the ASI Financials Software, or asked to export the data out of the ASI Financials Software so that it could be integrated into a different software system.

66.    Plaintiffs were also not consulted about any purported sale of Martin Flyer, Inc.'s limited license to use the ASI Financials Software, which, given the structure of the KGK deal as Plaintiffs understand it, would violate the terms of that license, and did not consent to such a sale by word or deed.

## MARTIN FLYER, LLC'S TRIAL LICENSE

67.    During the course of early to mid-July, Plaintiffs did not realize that there were

two "Martin Flyer" entities in existence – Plaintiffs were working at the same location, with the same people, and doing largely the same work. In fact, the ASI Financials Software that Plaintiffs had licensed to Martin Flyer, Inc., including over ten years of historical data associated with Martin Flyer, Inc., remained on the same server at the Martin Flyer offices on 48th Street that Plaintiffs had always worked at. To the extent Plaintiffs were doing additional or different work, such as transferring, renaming, or reorganizing files and/or database objects, Plaintiffs believed all of this work was just part of the transition associated with the Martin Flyer/KGK deal.

68.     Upon fully realizing, in mid- to late July, that Martin Flyer, LLC was an entirely separate entity from Martin Flyer, Inc., with Martin Flyer, Inc. still active and still using the ASI Financials Software (although no longer on the same server, which now appears to belong to Martin Flyer, LLC), Nick Santino informed defendant Josh Kaufman that Martin Flyer, LLC would need to buy a license if it wished to use the ASI Financials Software.

69.     In or around that time, Joshua Kaufman asked Nick Santino how much such a license would cost, and Nick Santino told him that it would cost approximately $85,000.00.

70.     Joshua Kaufman did not take the position that Martin Flyer, LLC had a license, or any right to use the ASI Financials Software for any reason. Rather, he simply indicated that he was unsure if the KGK Buyer would be interested in buying a license, and repeatedly stated "I can't promise anything."

71.     In order to show Martin Flyer, LLC and the KGK Buyer the value of the ASI Financials Software, based in large part on the relationship of trust and confidence that had been established between Plaintiffs and the Flyer family, which included Joshua Kaufman by marriage, and in the good faith belief that they might then buy a license, Plaintiffs offered to Joshua Kaufman and Martin Flyer, LLC a trial license to last three months or until Martin Flyer,

LLC made the decision not to purchase a license and terminate its relationship with ASI, and on the same terms that applied to the Martin Flyer, Inc. license.  Joshua Kaufman accepted this offer on Martin Flyer, LLC's behalf.  In addition, Martin Flyer, LLC hired Plaintiffs as outside Chief Information Officer ("CIO"), such that Plaintiffs played dual roles with Martin Flyer, LLC – first, as software providers in connection with the ASI Financials Software and Martin Flyer, LLC' database and second, as Martin Flyer, LLC's general IT and network manager, which included managing and maintaining its email and other IT functions that were unrelated to any ASI software.  ASI made sure to keep these roles entirely distinct, including providing separate invoices for network and database work.

## DEFENDANTS' MISAPPROPRIATION OF
## PLAINTIFFS' INTELLECTUAL PROPERTY

72.     Under the terms of the parties' contractual agreements, and under the generally applicable federal copyright and computer fraud and abuse statutes, Martin Flyer LLC was not permitted to access the ASI Financials Software code, was not permitted to acquire Argentto's passwords to access that code, and were not permitted to attempt to reverse engineer the ASI Financials Software in any way.

73.     Nevertheless, within days of having access to the ASI Financials Software for use in its business, the Martin Flyer and KGK Defendants began violating all of the above, and even began to invite other entities to either assist them in misappropriating the ASI Financials Software or help themselves to it for use in their own businesses.

74.     As Martin Flyer, LLC's CIO, I was supposed to be the only person with administrator access to Martin Flyer, LLC's network and email server.  This was especially important because, as explained above, the ASI Financials Software continued to reside on the same server it had been on when Martin Flyer, Inc. occupied the office space and owned the

16

computer equipment at Martin Flyer, LLC's current location.

75.     On or about July 21, 2009, Prasad Sahoo inquired about acquiring Administrator password access to the ASI system, which would include the ability, but not permission, to access substantial parts of the ASI Financials Software.

76.     Plaintiffs informed him that no one was allowed to modify or support the ASI Financials Software accounting system, and that it was copyrighted under federal law, and indicated that if the KGK Defendants wanted to install a different system at Martin Flyer, LLC, they were free to do so upon thirty days notice so that the parties could discuss the exportation of any data belonging to any of the Defendants.

77.     After Mr. Sahoo persisted in his requests, which became more like demands, Plaintiffs approached Joshua Kaufman, with whom they had a long-standing relationship of trust and confidence, and asked him how best to proceed, with an eye toward satisfying the potential client while still maintaining the integrity of their intellectual property.

78.     Mr. Kaufman used his position of trust and confidence to assure Plaintiffs that if they provided Mr. Sahoo with an Administrator password, it would not be used to access Plaintiffs' intellectual property, and would only be held in safe-keeping should something happen to Plaintiffs, who at that time had exclusive access to the system.

79.     Based on Mr. Kaufman's assurances, and in an effort to bolster their relationship of trust and confidence with the KGK Defendants, Plaintiffs provided Mr. Sahoo and Pradeep Bubna with an Administrator password by email, and asked them to make a note of it and then delete the email.

80.     Rather than use it for its intended emergency-only purpose, the Martin Flyer and KGK Defendants immediately began using the password to access server partitions that they were forbidden to access, which included the partitions that were then running the ASI Financials

Software, and which caused problems that cost Plaintiffs thousands of dollars to repair.

81.    One or more of the Defendants used the Administrator password to override Plaintiffs' own passwords, which allowed further and simpler unlawful access to Plaintiffs' intellectual property.

82.    In addition, in or about mid-July, one or more of the Defendants improperly accessed the portion of the servers that contained the ASI Financials Software and included that copyrighted software when making a manual copy of the servers.

83.    According to the Defendants, it is this unlawful copy of the ASI Financials Software that the Defendants are running to the current day.

84.    On or about August 9, 2009, Plaintiffs noticed that someone unaffiliated with ASI had altered some of the network settings, which cannot be done accidentally, and which required considerable ASI time, and therefore money, to fix. While this activity did not directly involve ASI's software or intellectual property, Plaintiffs became very concerned that some of the Defendants were going places they should not be going on the system and tampering with its security settings.

85.    Plaintiffs notified Joshua Kaufman immediately, and he intimated that he believed he knew who the culprit probably was, and would "look into" it. He never reported the results of that investigation to Plaintiffs.

86.    In an effort to protect their intellectual property, Plaintiffs began setting "traps" for would-be intruders into the ASI Financials Software, including creating database object names that they believed would attract curious eyes. Soon thereafter, Plaintiffs' fears for the security of the ASI Financials Software were realized.

87.    On or about August 17, 2009, an unauthorized person not only viewed one or more such database objects, but actually created a new database object within the ASI Financials

18

Software, both of which were strictly forbidden by applicable law and the terms of the license between ASI and the Defendants.

88.    Plaintiffs again immediately notified Joshua Kaufman and insisted that this issue must be resolved. After some investigation on his part, he reported back that defendant Lokendra "Lucky" Jain had asked defendant Prasad Sahoo, then working in China for defendant KGK Jewelry Mfg. Ltd. ("KGK China"), to create the database object, and that Sahoo had done so remotely from China.

89.    Understanding the seriousness of this matter, Joshua Kaufman called a meeting on August 19, 2009, which was attended by Joshua Kaufman, COO Eric Newnham, Lucky Jain, Pradeep Bubna, and Nick Santino. At that meeting, and consistent with the applicable terms and conditions and law of copyright, Joshua Kaufman reiterated to all present that absolutely no one but Nick Santino or another authorized ASI employee was allowed to touch the database, and that altering, deleting or creating any database objects was strictly forbidden.

90.    In addition, Joshua Kaufman sent an email to all of the attendants at the August 19 meeting, which read as follows:

> It has come to my attention that the [ASI Financials Software] Database has been compromised. The terms of our contract with Nick prohibit any party from creating any object in the database and extracting data. We have the right to all of our data and we can extract that data to create reports. However the creation of a report must be done outside of the system. As CEO of Martin Flyer I directed Nick to create a new password to eliminate further tampering which has cost Argentto Systems countless hours and dollars, and has limited Martin Flyer's work flow in the past two weeks.

91.    Finally, the parties entered into a Confidentiality Agreement, effective July 7, 2009 but signed by Joshua Kaufman and Pradeep Bubna on behalf of Martin Flyer, LLC on August 19, 2009, which states in relevant part:

> IV. SOFTWARE OWNERSHIP.    As between Martin Flyer Jewelry LLC Argentto Systems, all rights, titles, and interest, including copyright interests,

trade secrets and any other intellectual property, in and to the Software produced or provided by Argentto Systems, Inc under this Agreement shall be the property of Argentto Systems, Inc.  To the extent of any interest of Martin Flyer Jewelry LLC therein, Martin Flyer Jewelry LLC agrees to assign and, upon its creation, automatically to Argentto Systems Inc., the ownership of such Software, including copyright interests, trade secrets and any other intellectual property therein, without the necessity of any further consideration.

92.     At the August 19 meeting, Pradeep Bubna and Lucky Jain expressed dissatisfaction with this arrangement and stated that they believed they should have the right to create their own reports, using their own data, without having to go through ASI.

93.     As Plaintiffs have always, with every customer, including both Martin Flyer entities, respected the customer's ownership of its own data, Plaintiffs immediately explained that Martin Flyer, LLC did not have to go through ASI to use its own data, and that they were always free to use other providers.

94.     Specifically, the parties discussed the potential use of a third-party (non-ASI) application called Crystal Reports, which is a software system that could be set up in such a way that it could access the raw data that belongs to Martin Flyer, LLC through a secure channel (an "ODBC connection), without accessing any ASI intellectual property, and extract that data and put it into a pre-formatted Crystal Reports report.  In order to make sure the ODBC connection was properly set up to go around ASI's intellectual property on the way to Martin Flyer, LLC's data, however, Nick Santino insisted that he be the one to set up the access channel, and believed that the parties in attendance were in agreement.

95.     Within a few days, however, Plaintiffs discovered that Lucky Jain had removed his anti-virus program from his computer, downloaded and installed an unlicensed version of Crystal Reports, and had begun using it.  In addition to violating the parties' understanding, this caused the database to crash, which I then had to spend considerable time fixing.

96.     In or about this same time, one or more of the Defendants installed an "FTP

Explorer" program on the part of the system that contained the ASI Financials Software.

97.     An FTP program has one purpose only, which is to copy files from the system on which it resides and "upload" them to a remote location. The profile name for this FTP program was "CICA," which stands for Center for Innovative Computer Applications, was hosted by "kgkgroup.com," and had a login of "panyuacc," with Panyu, China being the location of one of the KGK Group or one of its sub-entities. On information and belief, the FTP program was installed with the assistance of one or more of the Defendants for the purpose of uploading ASI proprietary information to a remote computer location controlled by the KGK Group, and was used to do so.

98.     During the remainder of August and into September, Plaintiffs continued to see evidence of unauthorized activity on the Martin Flyer, LLC system, including in connection with the ASI Financials Software database, and had repeated conversations with Joshua Kaufman about it. This activity and ASI's time spent resolving the problems created by it are memorialized in ASI's invoices to Martin Flyer, LLC. For example, in ASI's September 8, 2009 Invoice No. 0900908, Plaintiffs included several entries for resolving "phantom" activity, which was how Plaintiffs referred to unauthorized activity, and noted parenthetically regarding certain substantial time entries that "most of this was due to someone touching db [the ASI database]." No one at Martin Flyer, LLC, including defendants Joshua Kaufman and Pradeep Bubna, who were both involved in processing ASI's invoices, ever objected to these entries and notations, or disputed that tampering had occurred, and Martin Flyer, LLC paid this invoice.

## DEFENDANTS' CONTINUED MISAPPROPRIATION OF PLAINTIFFS' INTELLECTUAL PROPERTY

99.     During the latter half of September, Joshua Kaufman ordered an unusually high amount of upgrades to the ASI Financials Software system, and wanted them completed in a very

short time frame. ASI provided them without hesitation. In fact, Plaintiffs continued to offer Martin Flyer, LLC discounts on services in the hopes of "closing the sale" with Martin Flyer, LLC and the KGK Buyer, whereby they would ultimately buy a license to the ASI Financials Software -- for example, Plaintiffs knocked a full 12 hours off of their October 5 Invoice.

100.    Plaintiffs' efforts to build any good will with a company like Martin Flyer, LLC or the KGK Defendants, however, proved to be extremely misguided, as their sense of entitlement to ASI's products and services for free dwarfed any discounts Plaintiffs could have given them.

101.    Joshua Kaufman knew why Plaintiffs were providing such discounts, and continued to lead Plaintiffs to believe that the KGK Buyer was undertaking a good faith look at ASI's products and services, when in fact they were just accumulating as much as they could before making their intentions known.

102.    As the Martin Flyer and KGK Defendants' later actions made clear, they had no intention of paying for all of these upgrades and improvements, but rather intended to take them for themselves with no intention of ever paying for them.

103.    On or about October 8, 2009, after Plaintiffs had spent over 80 hours during a 2.5 week period on Martin Flyer, LLC's behalf, Joshua Kaufman terminated the agreement between Martin Flyer, LLC and Plaintiffs. He was perfectly free to do this, of course, but the termination was paired with both (a) Martin Flyer, LLC keeping, and apparently intending to keep indefinitely, the ASI Financials Software running the core of its business and (b) an unexplained, and apparently planned, failure to pay ASI's invoice for the recent surge of activity.

104.    Again concerned for the integrity of their intellectual property, on ASI's October 9, 2009 Invoice, which they issued after ASI was terminated, Plaintiffs made sure to include the following note: "When transferring the data to new System, No Database objects are to be modified or created. Only data extraction as per agreement and Federal Copyright Laws."

22

105.     Both the October 5 and October 9 ASI Invoices initially went unpaid, and Martin Flyer, LLC gave every indication that they never intended to pay them.

106.     These events make clear that at least from September onward, Martin Flyer, LLC never had any intention to buy a license and also had every intention to use the ASI Financials Software regardless.  This is the only way to reconcile the fact that Martin Flyer, LLC spent close to $20,000.00 in upgrades to a system that (1) they were about to purportedly reject and/or replace with a different system and (2) was, under the applicable law and contract terms, owned exclusively by ASI, including the upgrades Martin Flyer, LLC had just requested.

## ARGENTTO'S CONTINUED GOOD FAITH AND DEFENDANTS' CONTINUED BAD FAITH

107.     During the course of conduct described above, Plaintiffs continued to provide IT services to Martin Flyer LLC, including fixing problems created by Defendants' unauthorized tampering with Plaintiffs' intellectual property; training new Martin Flyer LLC employees, many of whom came from one of the KGK Group entities, and appear to have played a dual role as employees and/or agents of both Martin Flyer LLC and one or more of the KGK Defendants; and generally advising Martin Flyer LLC regarding how to make the most use of the ASI Financials Software in its business.

108.     Despite never having any intention of ultimately purchasing a license to use the ASI Financials Software, Martin Flyer LLC continued to accept these benefits, which came at great cost to Argentto and which greatly benefitted Martin Flyer LLC.

109.     Because Martin Flyer LLC was never operating in good faith, it has unjustly received benefits from Plaintiffs for which Plaintiffs are entitled to reasonable compensation.

110.     During and after the trial license period, the Martin Flyer Defendants allowed the AGQA Defendants and the KGK Defendants to investigate the ASI Financials Software and

misappropriate, through whatever means they found most effective, it for themselves.

111.    Both the AGQA Defendants and the KGK Defendants accepted this invitation, and assigned their own IT personnel with the task of misappropriating the ASI Financials Software.

112.    Specifically, Steve Yeko directed Ted Krapf to misappropriate or improperly access all or certain elements of the ASI Financials Software, and Ted Krapf did so, including but not limited to during a trip to New York in October 2009 in which Mr. Krapf began attempts to reverse engineer the ASI Financials Software and attempted to remotely access servers located in ASI's offices and which the Defendants knew hosted the ASI Financials Software and other of Plaintiffs' proprietary information and intellectual property..

113.    Similarly, employees of KGK Jewelry (NY) and/or KGK Jewelry (China) – namely Alan Bloom, Prasad Sahoo, and Pradeep Bubna, were directed to misappropriate or improperly access all or certain elements of the ASI Financials Software, and did so.

114.    Joshua Kaufman has admitted and acknowledged – in writing – that the ASI Financials Software database was compromised in connection with Martin Flyer LLC's use of it during the 90-day period, and, in that same writing, clearly expressed his understanding that all aspects of the ASI Financials Software is legally protected and was not to be tampered with or altered in any way.

115.    During the course of conduct described above, Plaintiffs continued to provide IT services to Martin Flyer LLC, including fixing problems created by Defendants' unauthorized tampering with Plaintiffs' intellectual property; training new Martin Flyer LLC employees, many of whom came from one of the KGK Group entities, and appear to have played a dual role as employees and/or agents of both Martin Flyer LLC and one or more of the KGK Defendants; and generally advising Martin Flyer LLC regarding how to make the most use of the ASI Financials

Software in its business.

116.   Despite never having any intention of ultimately purchasing a license to use the
ASI Financials Software, Martin Flyer LLC continued to accept these benefits, which came at
great cost to Argentto and which greatly benefitted Martin Flyer LLC.

117.   Because Martin Flyer LLC was never operating in good faith, it has unjustly
received benefits from Plaintiffs for which Plaintiffs are entitled to reasonable compensation.

## DEFENDANTS' CONTINUED BAD FAITH, MISAPPROPRIATION AND
## COPYRIGHT INFRINGEMENT

118.   In or around October 2009, the Martin Flyer Defendants terminated their
relationship with Argentto, thereby ending any and all right to use or access the ASI Financials
Software.

119.   None of the Defendants currently hold any license to use or access the ASI
Financials Software, or any other Argentto intellectual property.

120.   Despite their lack of any color of authority to use any Argentto software or other
intellectual property, the Martin Flyer Defendants continue to openly use the ASI Financials
Software in the regular course of their business.

121.   Shockingly, but perhaps not surprisingly, the Martin Flyer and KGK Defendants
are currently using a version of the ASI Financials Software that they improperly copied, in
blatant violation of Plaintiffs' copyrights and other statutory and common law rights.

122.   Based on the foregoing, Plaintiffs are entitled to injunctive relief to stop this
egregious violation of the law and Plaintiffs' rights, disgorgement of all the profits the
Defendants have made as a result of their unlawful conduct, as well as millions of dollars in
compensatory and punitive damages.

123.   Moreover, each of the Defendants is jointly and severally liable to Plaintiffs for

the full amount of such disgorged profits and damages, and judgment should be entered against each and all of them for the full amount of same.

## FIRST CAUSE OF ACTION

### COPYRIGHT INFRINGEMENT AND CONTRIBUTORY COPYRIGHT INFRINGEMENT PURSUANT TO THE COPYRIGHT ACT

124.    Plaintiffs repeat and reallege each and every allegation set forth above as though fully set forth herein.

125.    By means of the actions complained of above, pursuant to 17 U.S.C. § 501, Defendants have infringed and will continue to infringe Plaintiffs' federally registered copyright in the ASI Financials Software by accessing, manipulating, altering, and using the ASI Financials Software without Plaintiffs' consent or authority, in violation of 17 U.S.C. § 106.

126.    Defendants' infringing conduct has caused and, unless restrained by this Court, will continue to cause Plaintiffs irreparable injury, for which Plaintiffs have no adequate remedy at law.

127.    Plaintiffs are entitled to an injunction restraining Defendants, their officers, agents, and employees, and all other persons acting in concert with them, from engaging in further such acts in violation of the federal copyright laws.

128.    Plaintiffs are further entitled to recover from Defendants the damages Plaintiffs have sustained and will sustain as a direct result of Defendants' wrongful acts. The amount of such damages cannot be determined at this time.

129.    Plaintiffs are further entitled to recover from Defendants the gains, profits, and advantages Defendants have gained as a result of their wrongful acts. Plaintiffs are at present unable to ascertain the full extent of the gains, profits, and advantages Defendants have obtained by reason of their acts in violation of the federal copyright laws.

130.    By reason of the foregoing, Plaintiffs are entitled to damages in an amount to be determined at trial, but believed to be in excess of five million dollars ($5,000,000).

131.    Defendants are willfully engaged in, and are willfully engaging in, the acts complained of with oppression, fraud, and malice, and in conscious disregard of the rights of Plaintiffs. Defendants' infringing actions are willful and deliberate, and Plaintiffs are entitled to statutory damages, as well as attorney fees and costs pursuant to 17 U.S.C. § 504 and 17 U.S.C. § 505.

**SECOND CAUSE OF ACTION**

**COMPUTER FRAUD AND ABUSE ACT**

132.    Plaintiffs repeat and reallege each and every allegation set forth above as though fully set forth herein.

133.    By means of the actions complained of above, pursuant to 18 U.S.C. § 1030, *et seq.*, Defendants have knowingly accessed a computer without authorization or exceeded their authorized access, and thereby obtained information from a protected computer, and caused Plaintiffs more than $5,000.00 in actionable damages.

134.    Plaintiffs have suffered, and will continue to suffer unless Defendants' unlawful conduct is restrained, substantial losses therefrom.

135.    Pursuant to 18 U.S.C. § 1030(g), Plaintiffs are entitled to compensatory damages from Defendants and injunctive or other equitable relief.

136.    By reason of the foregoing, Plaintiffs are entitled to damages in an amount to be determined at trial, but believed to be in excess of five million dollars ($5,000,000).

## THIRD CAUSE OF ACTION

### DIGITAL MILLENNIUM COPYRIGHT ACT

137.    Plaintiffs repeat and reallege each and every allegation set forth above as though fully set forth herein.

138.    By means of the actions complained of above, pursuant to 17 U.S.C. § 1201, *et seq.*, Defendants have circumvented a technological measure that effectively controls access to a work protected by federal copyright statutes, and have manufactured, imported, provided, or otherwise trafficked in a technology, product, service device, component, or part thereof that was primarily designed for the purpose of circumventing protection afforded by a technological measure that effectively protects Plaintiffs' copyrights under the federal copyright statutes.

139.    Plaintiffs are entitled to an injunction restraining Defendants, their officers, agents, and employees, and all other persons acting in concert with them, from engaging in further such acts in violation of the federal copyright laws.

140.    Plaintiffs are further entitled to recover from Defendants the damages Plaintiffs have sustained and will sustain as a direct result of Defendants' wrongful acts.  The amount of such damages cannot be determined at this time.

141.    Plaintiffs are further entitled to recover from Defendants the gains, profits, and advantages Defendants have gained as a result of their wrongful acts.  Plaintiffs are at present unable to ascertain the full extent of the gains, profits, and advantages Defendants have obtained by reason of their acts in violation of the federal copyright laws.

142.    By reason of the foregoing, Plaintiffs are entitled to damages in an amount to be determined at trial, but believed to be in excess of five million dollars ($5,000,000).

## FOURTH CAUSE OF ACTION

### MISAPPROPRIATION OF TRADE SECRETS

143.    Plaintiffs repeat and reallege each and every allegation set forth above as though fully set forth herein.

144.    The information reflected in the ASI Financials Software and code, and the accompanying unique and proprietary techniques for structuring data and database objects, constitute Plaintiffs' confidential and proprietary information and trade secrets (the "Trade Secrets").

145.    The Trade Secrets give Plaintiffs a significant competitive advantage over its existing and would-be competitors, which advantage would be lost if the Trade Secrets became known to the public or to Plaintiffs' competitors or would-be clients.

146.    Plaintiffs have made reasonable efforts under the circumstances to maintain the confidentiality of the Trade Secrets.

147.    Plaintiffs' Trade Secrets derive independent economic value from not being generally known to the public or to other persons who can obtain economic benefit from their disclosure.

148.    Defendants misappropriated Plaintiffs' Trade Secrets by (a) illicitly procuring a copy of Plaintiffs' code, (b) illicitly using Plaintiffs' Trade Secrets without authorization, and (c) illicitly disclosing Plaintiffs' Trade Secrets to third parties without authorization. Defendants have utilized and disclosed Plaintiffs' Trade Secrets for the benefit of themselves without Plaintiffs' consent and without regard to Plaintiffs' rights, and without compensation, permission, or license.

149.    Defendants' conduct was, is, and remains willful and wanton, and was undertaken with blatant disregard for Plaintiffs' valid and enforceable rights.

150.    By reason of the foregoing, Defendants have been unjustly enriched and Plaintiffs have suffered irreparable harm as a result of the misappropriations of their Trade Secrets, and will continue to suffer irreparable harm, which cannot be adequately redressed at law, unless Defendants, their agents, and all those acting in concert with them are enjoined from engaging in further acts of misappropriation.

151.    Plaintiffs are further entitled to recover from Defendants the damages Plaintiffs have sustained and will sustain as a direct result of Defendants' wrongful acts.  The amount of such damages cannot be determined at this time.

152.    Plaintiffs are further entitled to recover from Defendants the gains, profits, and advantages Defendants have gained as a result of their wrongful acts.  Plaintiffs are at present unable to ascertain the full extent of the gains, profits, and advantages Defendants have obtained by reason of their misappropriation of Plaintiffs' Trade Secrets.

153.    By reason of the foregoing, Plaintiffs have suffered damages in an amount to be determined at trial, but believed to be in excess of five million dollars ($5,000,000).

154.    Plaintiffs also reserve the right to see punitive and exemplary damages, and attorneys' fees, as a result of Defendants' willful and wanton conduct.

## FIFTH CAUSE OF ACTION

## BREACH OF CONTRACT

155.    Plaintiff repeats and realleges each and every allegation set forth above as though fully set forth herein.

156.    Defendants were bound by the Terms and Conditions of their agreement with Argentto concerning the ASI Financials Software.

157.    In accordance with these contracts, Defendants were only entitled to utilize the ASI Financials Software with the authorization of Argentto.

158.    In accordance with these contracts, Defendants were bound to hold all of Plaintiffs' Trade Secrets in strictest confidence.

159.    In accordance with these contracts, all rights in and to the works created were the property of Plaintiffs.

160.    In breach of their contractual obligations, Defendants without Plaintiffs' knowledge or consent have continued to utilize the ASI Financials Software.

161.    In breach of their contractual obligations, Defendants without Plaintiffs' knowledge or consent have continued to use, disclose and/or share with third parties Plaintiffs' Trade Secrets.

162.    The aforesaid acts of Defendants have caused and shall cause Argentto damages in an amount not yet fully determined, but believed to be in excess of five million dollars ($5,000,000.00).

## SIXTH CAUSE OF ACTION

### UNJUST ENRICHMENT

163.    Plaintiffs repeat and reallege each and every allegation set forth above as though fully set forth herein.

164.    Defendants' adoption, reproduction, and/or use of Plaintiffs' Trade Secrets and confidential and proprietary business information including, among other things, Plaintiffs' ASI Financials Software and other intellectual property, has unjust enriched Defendants by giving them the benefit of Argentto's highly sophisticated and valuable intellectual property, and depriving Plaintiffs of profits from the sale or licensing of their ASI Financials Software.

165.    Plaintiffs have suffered irreparable harm and damages as a result of Defendants' acts and are suffering money damages in an amount not yet fully determined, but believed to be in excess of five million dollars ($5,000,000).

## SEVENTH CAUSE OF ACTION

### UNFAIR COMPETITION

166.    Plaintiffs repeat and reallege each and every allegation contained above as though fully set forth herein.

167.    The acts described above constitute unfair competition under New York law.  The acts include, but are not limited to misappropriation of trade secrets and the exploitation of same, thereby depriving Plaintiffs of sales of licensing for its intellectual property and of its IT services.

168.    Defendants' acts were and are intentional and carried out for the purpose of competing unfairly with Plaintiffs.

169.    Plaintiffs have been damaged by Defendants' actions and are also suffering irreparable harm for which they have no adequate remedy at law.

170.    As a direct, proximate and foreseeable result of such unlawful conduct, plaintiffs have suffered money damages in an amount to be determined at trial, but believed to be in excess of five million dollars ($5,000,000).

### JURY DEMAND

171.    Plaintiffs hereby demand a trial by jury on all issues so triable.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that judgment be entered in their favor and against Defendants as follows:

1.      Granting Plaintiffs preliminary injunctive relief, as follows:

a.      Defendants, and all those acting in concert and participation with them, are prohibited from, directly or indirectly, utilizing, divulging, copying, cloning, recreating and/or modifying Plaintiffs' confidential and proprietary information and/or trade secrets, including but not limited to Plaintiffs' source and object codes and other computer codes,

computer programs and software, algorithms, strategic plans, customer information and any and all documents, computer files, computer diskettes, or information that Defendants may have derived from Plaintiffs' confidential and proprietary information and/or trade secrets, including without limitation, the software currently or formerly identified as ASI Financials Software; and

     b.     Defendants are ordered to preserve and retain, and are enjoined from destroying, deleting, transferring or modifying in any way, all documents, tangible items and information (including information stored electronically), whether in their custody or control or the custody or control of their lawyers, agents, family members, friends, or any other person representing them or acting on their behalf: (i) that relate to Plaintiffs or any affiliated entities; or (ii) that otherwise relate to the subject matter of this dispute.

2.     Granting Plaintiffs the following permanent injunctive relief:

     a.     prohibiting Defendants, and all those acting in concert and participation with them, from, directly or indirectly, utilizing, divulging, copying, cloning, recreating and/or modifying Plaintiffs' confidential and proprietary information and/or trade secrets, including but not limited to, Plaintiffs' source or object codes and other computer codes, computer programs and software, algorithms, strategic plans, customer information and any and all documents, computer files, computer diskettes, or information that Defendants may have derived from Plaintiffs' confidential and proprietary information and/or trade secrets; including without limitation, the program currently or formerly identified as ASI Financials Software;

     b.     Requiring Defendants to provide immediately to Plaintiffs, the originals and all copies – whether on paper, in computer memory, file, disk or stored on any other kind of medium – of Plaintiffs' confidential and proprietary information and/or trade

secrets in Defendants' possession, custody, or control, or in the possession, custody or control of their lawyers, agents, family members, friends or any other persons representing Defendants or acting on their behalf;

        c.      Enjoining Defendants from distributing, selling, marketing, licensing, disseminating, transferring, operating, or otherwise utilizing the copyrighted ASI Financials Software in perpetuity, including any of the source code, components or subsystems of the program;

        d.      Enjoining Defendants from distributing, selling, marketing, licensing, disseminating, transferring, operating, or otherwise utilizing any computer software or program based in whole or in part on Plaintiffs' confidential and proprietary information and/or trade secrets in perpetuity;

        e.      Enjoining Defendants from interfering with the current and prospective advantageous business relationships between Plaintiffs and its customers;

        3.      Awarding Plaintiffs damages and prejudgment interest against Defendants, jointly and severally, in an amount to be determined at trial, but believed to be not less than $5 million, plus punitive damages to punish Defendants for their intentional misconduct;

        4.      Awarding Plaintiffs such statutory, exemplary or punitive damages as the Court deems just and proper;

        5.      Awarding Plaintiffs their attorneys' fees and costs incurred in connection with this action; and

6.    Awarding such other and further relief as the Court deems just and proper.

Dated: New York, New York
   March 16, 2010

By: _____
     Adam E. Engel

A.E. ENGEL & ASSOCIATES, LLC
1040 Avenue of the Americas, 24th Floor
New York, New York  10018
(212) 665-8095

Attorney for Plaintiffs Argentto Systems,
Inc. and Nick Santino